The Honorable Bobby L. Hogue State Representative and Speaker of the House P.O. Box 97 Jonesboro, Arkansas 72403-0097
Dear Mr. Speaker:
This is in response to your request for an opinion on whether the relocation of the "Northeast Arkansas District Fair" (or "fairgrounds") from one part of the City of Jonesboro to another part of the City would comply with the existing Jonesboro zoning ordinance.
It is my opinion that the answer to your question is "no."[1]
You have enclosed with your request a letter from the Mayor of Jonesboro providing additional information regarding this issue, and this office has received voluntarily submitted letter briefs from parties interested on each side of the issue. This information indicates that the existing fairgrounds is located on a forty-acre tract of land which is zoned "C-3" ("commercial district-3") in the City of Jonesboro. In 1994, however, the Board of the Northeast Arkansas District Fair purchased an approximately eighty-acre undeveloped tract in the Northeast part of the City (in an area recently annexed to the City) and intends to relocate the fairgrounds there. The newly purchased property is currently located in an area zoned "R-1" or "residential-1" by the City. A dispute has arisen over the legality, under the City zoning ordinance, of locating the fairgrounds in an area zoned "R-1."[2]
In my opinion it will be helpful at this stage to set out some pertinent provisions of the zoning ordinance. The ordinance designates three different types of residential districts: R-1, R-2 and R-3. The R-1 district is defined as a "district of relatively low density population, where children are members of most families and where there is an absence of all activities of a commercial nature including home occupations in order to preserve the characteristics of the district." Jonesboro Municipal Code, § 14.08.02. The permitted uses in such districts are: 1) single family residences; 2) accessory buildings (for family purposes and domestic servants but not for rental); 3) "Community uses. Public parks, playgrounds and open spaces; churches, public schools and utility or governmental facilities." Also allowed in such districts are plant nurseries, gardens and farms, but not sales offices for the same and no signs are permitted. Id. at § 14.08.02(a) and (b). In R-1 districts, the following uses are prohibited: 1) all commercial and industrial uses; 2) billboards and advertising; 3) multi-family residences, including duplexes; 4) most home occupations; and 5) the raising, selling, or keeping for commercial purposes of certain livestock. § 14.08.02(c). In addition, in R-1 districts, only one principal building may be built on any lot. § 14.08.02(d)(5).
Residential-2 or "R-2" districts are defined as those districts "of relatively low density population, where children are members of most families and where there is an absence of commercial activities but with limited home occupations and limited private and public community uses." Permitted uses in an R-2 district include: 1) single-family residences, duplexes and apartments (the latter two only if they comply with certain area and bulk requirements); 2) home occupations, including room renting, dressmaking, music and dance instruction, and other home offices of types not requiring retail sales nor personal services on the premises; 3) accessory buildings for certain purposes, but not for rental; and 4) "Community uses. Parks, playgrounds, community centers and swimming pools, governmental facilities or utilities, libraries, public schools, child nurseries and kindergartens, churches." See § 14.08.03(a). Also permitted are certain plant nurseries, gardens and farms, but with not sales offices and each must comply with city ordinances regulating the location and maintenance of animals. § 14.08.03(b). All commercial and industrial uses are prohibited as are billboards and advertising (except very small business signs). Also prohibited is the raising, selling or keeping for commercial purposes of certain livestock and farm animals. § 14.08.03(c). Again, only one principal building shall be built on any lot. § 14.08.03(d)(5).
An R-3 district is defined as "an area devoted mainly to residences but where home occupations including rentals are customary." Permitted uses in such districts are: 1) single-family duplexes and apartments; 2) home occupations including professional offices, dressmaking, home beauty shops, music instruction, room renting, boardinghouses, and other businesses which are incidental to or can be conducted within a home or residence if complying with area and bulk regulations; 3) accessory buildings which may be used for customary uses, living quarters or for any home occupation; 4) "Community uses. All community uses of a public or private nature which are compatible with the existing residential district." § 14.08.04(a). Also permitted are multi-family apartments if they comply with all area and bulk requirements. § 14.08.04(b). Prohibited are: 1) all commercial and industrial uses; and 2) all billboards and advertising displays (except business signs of a certain size). § 14.08.04(c). Again, only one principal building may be built on any lot. § 14.08.04(d)(5).
The issue under the zoning ordinance appears to revolve around whether the fairgrounds may be characterized as a "community use" under the ordinance. Your two specific questions in this regard as follows:
 1. Should the Northeast Arkansas District Fair be considered a community use?
 2. If it is determined that it is a community use, based on the enclosed residential R-1 zoning ordinance, can it be located in the residential R-1 zoning district?
The ordinance does not define the term "community use." I have found no helpful case law from this jurisdiction or any other defining this term in the context of zoning, much less any case discussing the inclusion of a fairgrounds within the definition of the term. It appears that the term "community use" is not a "term of art" in zoning parlance. As has consistently been stated in opinions of this office, I cannot provide a controlling definition of a term where the legislative body has not seen fit to provide one. See, e.g., Op. Att'y Gen. 94-225. When such a term in a zoning ordinance is undefined, however, the Arkansas Supreme Court has stated that it will examine the ordinance in light of its purpose and in light of the use to be made of the property. Arkansas Release Foundationv. Hummel, 245 Ark. 953, 435 S.W.2d 774 (1969) (holding that a "halfway house" for ex-penitentiary inmates was not an institution of a "philanthropic nature" so as to be permitted in a "class D apartment district"). The court in Hummel stated that the chancellor was entitled to consider the overall purpose of zoning ordinances in general in determining whether appellant's proposed use of its property was permissible under the provisions of the ordinance. Id. at 964. The court cited several treatises on zoning and the Arkansas statutes granting zoning authority to municipalities, as follows:
 (a) Cities of the first and second class are authorized to establish zones limiting the character of buildings that may be erected therein.
(b) Zones may be of three (3) classes:
 (1) Portions of the city where manufacturing establishments may be erected or conducted;
 (2) Portions of the city where business other than manufacturing may be carried on; and
(3) Portions of the city set apart for residences.
A.C.A. § 14-56-301 (1987).
 (a)(1) When the city council shall have laid off zones, it shall not be lawful for anyone to contract or carry on within a given zone any business not authorized by the ordinance of the city establishing it, unless with special permission granted by the council of the city, or by a commission which it may create for the purpose of determining whether an exception shall be made, in the particular instance.
(2) Exceptions shall be made only for good cause.
 (b) In case of abuse, the adjacent property owners shall have the right to appeal to the courts of chancery to protect their property from depreciation by reason of the setting up of exceptional business within the zone.
A.C.A. § 14-56-305 (1987).
It is my opinion, in light of the language of Hummel and the statutes cited above, and in response to your first and second questions, that even if the fairgrounds could be considered a "community use," it is not a "community use" permitted in an R-1 residential district under the ordinance. The question of whether the fairgrounds constitutes a "community use" at all, is a question of fact. It has been stated that:
 [I]n determining whether or not the use to which property is being used comes within the classification of use permitted in a zone under the particular facts of any case is a question of plain fact. The use conforms or its doesn't and each case must rest on its own particular facts.
Hummel, supra at 964, quoting Yonkley, Zoning Law and Practice, § 161 p. 320.
This office is not empowered as a factfinder, and cannot as a practical matter, decide such issues of fact. A factfinder would have to evaluate all the pertinent evidence surrounding the conduct of the fairgrounds, including the uses to which the property is routinely put, in order to arrive at a decision as to whether the use of the property would fall within the definition of a "community use."[3] It is my opinion, however, that the question of whether the fairgrounds constitutes a "community use" under the zoning ordinance is irrelevant, in light of the fact that the ordinance, in my opinion, only allows certain types of "community uses" in R-1 residential districts.
As was set out earlier in this opinion, each type of residential district allows some form of "community use" property. In R-1 residential districts, the community uses specifically listed are "public parks, playgrounds and open spaces, churches, public schools and utility or governmental facilities." "R-2 residential districts" are defined as including "limited private and public community uses." § 14.08.03. The "community uses" listed under the R-2 district category are the same as listed in the R-1 category with the addition of "community centers and swimming pools," "libraries," and "child nurseries and kindergartens." In an R-3 district "all community uses of a public or private nature which are compatible with the existing residential district" are permitted. Thus, when the ordinance is read as a whole, it can be seen that all types of community uses are not allowed in R-1 or R-2 residential districts. All types of community uses are allowed only in R-3 residential districts. To construe the ordinance otherwise would render nugatory the express language concerning community uses in R-1 and R-2 districts. In addition, it is my opinion that the ordinance sets out a progressive scheme of authorizing additional community uses with the progression of residential district numbering. All "community uses" are authorized in R-3 districts; something less is authorized in R-1 and R-2 districts, and in my opinion a fairgrounds is not included in the latter category.
It is my opinion therefore that the answer to your first question will be one of fact. In any event, even if as a factual matter, the fairground is determined to be a "community use," it is my opinion that it cannot be located in an R-1 district. Thus the answer to your second question is in my opinion "no."
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
WB:ECW/cyh
[1] This office does not ordinarily construe the provisions of local city ordinances. Such questions often involve determining the intent of the city council members enacting the same, a task for which this office is not particularly well situated. Ordinarily the city attorney or other counsel to whom the city normally looks for legal advice is in a better position to answer such questions. Because, however, in my opinion the language of the ordinance is unambiguous, and can be read on its face to provide an answer to the questions you pose, I will, as you have requested, provide my advisory opinion on the matter.
[2] One of the letter briefs indicates that the homeowners surrounding the new property filed a lawsuit on March 3, 1995, alleging that the location of the fairgrounds on the new site would constitute a nuisance. An agreement was entered into by the homeowners and the Fair Board not to litigate the matter until the City rendered its decision regarding the proposed action (presumably in the form of a zoning decision). It appears, therefore, that although there is litigation currently pending on this matter, the precise issue posed by your question is not the subject of that litigation. This office's policy, therefore, against issuing opinions on matters which are the subject of pending litigation does not appear to be implicated by your request.
[3] The information submitted with your request indicates that in addition to the annual "fair" the current property is used for farm equipment auctions, livestock shows, flea markets, arts and crafts shows, gun shows, dances, concerts, rodeos, and other uses.