## HAROLD G. HAWKINSON v. COUNTY OF ITASCA.

231 N. W. 2d 279.

June 20, 1975—No. 44199.

---

*William W. Essling,* for appellant.

*W. J. Spooner,* County Attorney, for respondent.

Heard before Sheran, C. J., and Otis, Scott, and Knutson, JJ., and considered and decided by the court en banc.

OTIS, JUSTICE.

This is an action for a declaratory judgment to set aside an Itasca County ordinance zoning plaintiff's property residential, and to authorize plaintiff to develop and expand lakeshore property for recreational-commercial purposes, or in the alternative to recover damages. The matter was tried to the court without a jury. Plaintiff appeals from the court's decision that he was entitled to no relief other than the right to continue a nonconforming use of his lakeshore lots. We affirm.

The area in question is located on the southwest shore of "Sherry's Arm" of Lake Pokegama in Itasca County. Between the years 1958 and 1966, plaintiff acquired 32 acres of land with 1,500 feet of shoreline, described as lakeshore lots 50, 51, 52, 53, 61, 62, 63, 64, and 65; outlot F containing 4 1/2 acres; and outlot G containing 17 acres, both outlots being west of and adjacent to the lakeshore lots, separated from them only by a roadway. The property has access to State Highway No. 17 by virtue of the fact the highway runs through the southwest corner of outlot G.

On October 2, 1969, Itasca County adopted an ordinance, effective November 1, 1969, which zoned all of plaintiff's property as residential. Prior to that time, the property remained unzoned. The ordinance contained the following provisions:

"*Sec. 4.10 Non-Conforming Uses*—Any use of a structure

and/or premises existing at the time of enactment * * * of this ordinance, but not in conformity with its provisions, may be continued provided that:

"*Sec. 4.11*—the use is not changed to another non-conforming use or re-established if discontinued for a continuous twelve (12) month period.

"*Sec. 4.12*—no existing structure devoted to a non-conforming use shall be enlarged, extended, constructed, moved, or structurally altered except in changing the use of the structure to a use consistent with the provisions of this ordinance."

At the time the ordinance was adopted, plaintiff operated a small recreational-commercial business on his lakeshore lots on which he had a summerhouse, trailer sites, a playground, beaches, a boat harbor, launching equipment, and a commercial fishing pond. Work had been commenced on a utility building, an excavation dug for a motel-lodge, and other preparations had been made in anticipation of ultimately expanding the business. However, the progress of the work had been slowed substantially after 1966 when plaintiff sustained injuries in an automobile accident.

The issue is whether plaintiff has acquired a vested right to complete the work which he has commenced and to carry out the plans for an integrated commercial-recreational area for the entire 32 acres. The trial court held that outlots F and G had not been developed to any substantial degree, were not being used for commercial-recreational purposes, and consequently were properly zoned residential without any nonconforming use being permitted. As to lakeshore lots 50 to 53 and 61 to 65, the court held that they were being used for commercial-recreational or recreational-residential purposes, that plaintiff was entitled to continue those nonconforming uses, but that he would not be permitted to enlarge them without the approval of the county planning commission. The court did, however, permit any building under construction to be completed.

Plaintiff raises the following questions:

"The term 'enlarge' is ambiguous and unclear in many respects. Does it mean geographical, vertical, or horizontal? Does it include or exclude normal increase in volume of business and such improvements as may be necessary to maintain the business facilities or to accommodate normal increase in business?"

More specifically, plaintiff asserts a right to complete a utility building on lot 65; to construct eight dwelling units on lot 62; to erect a lodge with a kitchen and dining room and a 32-unit motel on lots 50 to 53; and to install a sewage-disposal facility on outlots F and G, on which he also wishes to construct a parking lot, storage building, community building, and office headquarters, and to use some of this area as camping and trailer sites.

Plaintiff testified he had spent over $108,000 in developing the area as an integrated recreational unit and that he had plans for an overall investment of some $275,000, of which $50,000 represented a prospective loan approved by the Small Business Administration. Of the amount actually expended, however, $28,800 represented the purchase price of the entire area, $20,000 represented the value of his services and those of his family, and $18,000 represented his estimate of the rental value of equipment and machinery he himself owned and used in preparing the project for development.

Outlot G, which was zoned residential without any nonconforming use, consisted of 17 acres on which no buildings had been erected. Plaintiff testified that it had been cleared of brush and that 500 truckloads of stumps had been removed in anticipation of developing ski slopes, toboggan slides, and snowmobile trails. That lot contained the access road from State Highway No. 17 to all the other lots. Culverts and bridges over a clear stream had been constructed and a pond dredged. Plaintiff had excavated for a small office building and a snowmobile storage building which he asserts a right to complete. A community building for guests had also been planned. In addition, outlot G was designed to provide a sanitary sewer system for lots 61 to 65 although the

line had not yet been installed. The trial court found that outlots F and G were not "being used to any extent, and probably not at all, for the furtherance of a non-conforming use." The court also expressly held that plaintiff could not build a sewage-disposal system on outlot G without obtaining authority from the planning board, which had previously refused to give its consent.

Outlot F, which consisted of 4 1/2 acres, was also zoned residential without any nonconforming use allowed. It had no buildings and none were planned. This area was to be used for camping, hiking, and parking, and was the site for a sewer system designed to service lakeshore lots 50 to 53. Sewer and water lines had not been installed but some preparation had been made for them.

Lakeshore lots 61 to 65, which were adjacent to outlot G, although separated by a roadway, contained a residence, a utility building, a septic tank and water mains, a playground, electric lines, nine trailer sites, a parking area, and a beach and harbor where boats were rented. Construction was in progress on the utility building on lot 65 and the trial court held plaintiff could complete the structure "as commenced before the zoning ordinance was passed. This does not mean that he can enlarge the building or change it in any way; but the Court sees no reason why he cannot complete a structure which was already commenced."

Plaintiff, on appeal, seeks clarification of his authority to continue work on the utility building. That structure at the time the ordinance was adopted was 28 feet in width and 44 feet in length with a 12-foot ceiling. In building it, plaintiff planned to include a laundry room, shower room, and toilets on the first floor, and to build a snack bar, gift shop, and caretaker's apartment on the second floor, which was at grade level. As we construe the trial court's order, it was intended to permit plaintiff to complete the second floor but to prohibit any enlargement of the original ground floor dimensions. With this decision we are in accord,

and hold that plaintiff may proceed to finish the construction of this building according to those plans.

With respect to a proposed addition to plaintiff's summer home on lot 62 of eight two-story dwelling units, we take a different view. No work had been commenced on that project and to undertake it after the adoption of the ordinance would, in our opinion, clearly be a violation of the ordinance by adding nonconforming commercial residential units to an existing structure devoted to a conforming use.

Lakeshore lots 50 to 53 are north of lots 61 to 65 and separated from outlot F only by a roadway. Lots 50 to 53 included commercial trout fishing ponds and contained a parking area and a ramp for launching boats. This area was serviced by water, sewer, and electricity. Three buildings are located on it, a dwelling, a fish-food house, and a garage. A principal source of contention in these proceedings is plaintiff's claim that he was entitled to construct a lodge with a dining room, kitchen, lounge, enclosed swimming pools, and enclosed trout pond over an excavation which had concrete walls and was once used as a pond. In addition, plaintiff asserts the right to complete a 32-unit motel which would be a wing of the lodge. The trial court found that lakeshore lots 50 to 53 were being used for commercial-recreational purposes at the time the zoning ordinance was adopted, and held that plaintiff was entitled to continue his nonconforming use "but shall not enlarge the same." We concur in this conclusion as to lots 50 to 53.

In arriving at its decision, the trial court found that lakeshore property on Sherry's Arm of Lake Pokegama is occupied almost entirely by summer cottages and year-round homes of a residential nature. It also found that outlot F was best adapted for residential use and outlot G "ideally located" for residential purposes. In addition, the court found that these lots have been put to no commercial use and had not had improvements of a substantial nature. We believe the evidence supports these conclusions. The kind of improvements which were made on the outlots

were as consistent with the development of a residential area as with a commercial-recreational area. The grading and clearing of the land, and the dredging and development of the pond and stream added substantial value to the property for residential purposes. The effort and expense applied to these outlots are not wasted by the zoning.

The same may be said of the lakeshore property. While it is true that plaintiff's long-range plans have been frustrated, he is not prevented from carrying on at the same level which obtained before the zoning ordinance was adopted. We are aware of no authority which would permit plaintiff to expand an excavation with a concrete wall into a full-blown summer resort with a 32-unit motel attached. To permit such an expansion would do violence to the well-established rule that nonconforming uses are to be restricted in a way which will be conducive to their ultimately being phased out, County of Freeborn v. Claussen, 295 Minn. 96, 102, 203 N. W. 2d 323, 327 (1972).

Plaintiff cites Hawkins v. Talbot, 248 Minn. 549, 80 N. W. 2d 863 (1957), for the proposition that "geographic expansion within the original area is permissible." That case, however, involved the continuing nonconforming use of a gravel pit. We pointed out that by the very nature of that business it had to expand the area of its operation or be deprived of all value. Plaintiff also cites Connor v. Township of Chanhassen, 249 Minn. 205, 81 N. W. 2d 789 (1957), to support his claim that he has a vested right to continue his nonconforming use even at a different location if the area where his business is located is condemned. It is enough to say that those circumstances do not here exist, and plaintiff is entitled to carry on the precise business in which he was engaged at the time that the zoning ordinance was adopted.

Under what circumstances a property owner may complete a project which is in progress at the time his use of the property becomes nonconforming is a difficult question. Its resolution is ordinarily governed by the degree of hardship which would be imposed if construction or expansion were halted before comple-

tion. The rule is set forth in 8A McQuillin, Municipal Corporations (3 ed.) § 25.188, as follows:

"The general rule is that actual use as distinguished from merely contemplated use when a zoning restriction opposed to it becomes effective is essential to its protection as a lawful nonconforming use. Accordingly, the question of an existing business or other use at the time zoning restrictions become effective must be considered in the light of the principle that the law is concerned, not with a mere plan or intention, but with overt acts or failure to act. Thus, it is not the present intention to put property to a future use but the present use of the property which must be the criterion. That is to say, mere intentions or plans at the time a zoning ordinance becomes effective to use particular land or dwellings for a certain use does not entitle one to that use in contravention of the ordinance. * * *

"* * * However, substantial expenditures, work or change of position relative to erection of a building or establishment of a business, in addition to purchase of land, may entitle one to protection against subsequent zoning."

Plaintiff cites Board of Commrs. v. Petsch, 172 Neb. 263, 109 N. W. 2d 388 (1961), to support the rule that once a project is started the owner is entitled to a nonconforming use of the entire area when construction has been completed. Petsch dealt with the nonconforming use of a trailer park. There, the property owner had installed 13 trailers in an area which was staked out for 59. Water, sewer, telephones, and power were available to the entire tract. Under those circumstances, the Nebraska court held that the owners had a vested interest in a nonconforming use of both the space being used and the space which was being prepared for use. However, the court added,

" * * * A contemplated or intended use, standing alone, is not sufficient. In other words, where a trailer-court project is partially completed when zoning regulations become effective, and the evidence is clear as to the extent of the project, the completed

project will ordinarily determine the scope of the nonconforming use." 172 Neb. 268, 109 N. W. 2d 391.

In a later decision, County of Saunders v. Moore, 182 Neb. 377, 381, 155 N. W. 2d 317, 320 (1967), the Supreme Court of Nebraska declined to permit a nonconforming trailer park to be completed where " * * * there were no developed facilities available to accommodate any trailers and * * * the parking of any trailers on the property would be little other than parking trailers on open farm land which is adjacent to a well and an electrical source." The court distinguished Petsch and held that in the Moore case the owner showed no substantial construction had been made or substantial liabilities incurred.

"* * * The rule to be deduced from the above authorities is that preliminary contracts or work which are not of a substantial nature and contracts or work consistent with the zoning ordinances and regulations are not considered to be substantial construction or liabilities relating directly to the intended use which has become nonconforming because of the change or adoption of the regulations or ordinances." 182 Neb. 379, 155 N. W. 2d 319.

Two cases cited by plaintiff, decided by intermediate courts of appeal in Ohio, dealt with trailer parks under partial construction when zoning regulations were enacted. Meuser v. Smith, 74 Ohio L. Abs. 417, 141 N. E. 2d 209 (1956); Kessler v. Smith, 104 Ohio App. 213, 142 N. E. 2d 231 (1957). The Meuser case indicates that work had begun on the foundation of a utility building, and grading had been started as well as contracts let for water, sewer, and electricity. In permitting the project to be completed, the court did not indicate what expenses had been incurred in reliance on the absence of zoning. The Kessler opinion, on the other hand, which also allowed completion of the park, disclosed expenditures of $20,500 before the property involved was zoned. By way of contrast, however, the two outlots F and G were found by the trial court in this case not to have been developed in any

substantial manner and to be entirely suitable for residential purposes.

A Federal court, in construing Michigan law, held in City of Ann Arbor v. Northwest Park Const. Corp. 280 F. 2d 212 (6 Cir. 1960), that the removal of many trees and stumps in preparation for use as commercial property, the grading of the land, and other preparations did not create a vested right in commercial zoning after the property was rezoned for residential use. Likewise, the expenditures for acquisition of the property itself may not be included in the consideration of plaintiff's investment for commercial purposes, R. A. Vachon & Son, Inc. v. City of Concord, 112 N. H. 107, 111, 289 A. 2d 646, 649 (1972); Mayor and City Council of Baltimore v. Shapiro, 187 Md. 623, 634, 51 A. 2d 273, 279 (1947). The rule is stated in 8A McQuillin, Municipal Corporations (3 ed.) § 25.188, p. 32, as follows:

"A purchase of property with an intention to use it for a particular purpose does not in itself give a right to use it for that purpose as against a subsequent zoning ordinance or restriction. Indeed, the fact that a party makes a large investment in a city lot, which at the time it is purchased is free of restrictions, with an intent to use it for business purposes, does not invalidate a zoning ordinance subsequently adopted insofar as that ordinance restricts the use of the lot to residential purposes."

To the same effect is Town of Lebanon v. Woods, 153 Conn. 182, 215 A. 2d 112 (1965).[1]

Our conclusions concur with those well summarized by the Supreme Court of Iowa in Board of Supervisors v. Paaske, 250 Iowa 1293, 1300, 98 N. W. 2d 827, 831 (1959):

"It is impossible to fix a definite percentage of the total cost which establishes vested rights and applies to all cases. It depends on the type of the project, its location, ultimate cost, and principally the amount accomplished under conformity. Each

---

[1] See, also, Note, 49 Minn. L. Rev. 973, 985.

case must be decided on its own merits, taking these elements into consideration."

For plaintiff to prevail, it is not enough that he show *some* prejudice in not being permitted to carry out his plans. There must be *substantial* prejudice. Harris Used Car Co. v. Anne Arundel County, 257 Md. 412, 419, 263 A. 2d 520, 524 (1970).

By way of conclusion, we hold that plaintiff has not acquired a vested right to complete the plans which he had developed before November 1, 1969, to create an integrated commercial-recreational area for the lakeshore lots and outlots. In our opinion, the expenses plaintiff incurred by way of preparation did not result in prejudice so substantial as to permit him to complete the project. We have previously indicated that the trial court's findings that outlots F and G are well suited for residential use are supported by the evidence. That evidence strongly suggests that the work done by plaintiff in those areas enhanced their value for residential use. As to the lakeshore lots, we further hold that it is proper for plaintiff to complete the utility building located on lot 65 by enlarging it vertically. However, we concur in the trial court's determination that work on the lodge and motel units had not progressed sufficiently to justify a completion of those buildings. Nor may plaintiff complete the eight units planned for lot 62.

What may, in the future, be permissible improvements to accommodate an increase in the volume of business, and what may be an impermissible enlargement or expansion of existing facilities, it is not now possible to predict. Such matters are better left to resolution by the Board of Itasca County Commissioners, and the Itasca Planning Advisory Commission rather than for us by way of dictum to propose an imprecise formula.

Affirmed.